UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

VERONICA JEAN,

    Plaintiff,

v.                                                                          CASE NO.:

MILLENNIUM PHYSICIAN GROUP, LLC,
A Florida limited liability company,

    Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INTRODUCTION

1. Plaintiff, VERONICA JEAN ("Ms. Jean" or "Plaintiff"), brings this action pursuant to 42 U.S.C. §1981 for race harassment, discrimination and retaliation ("Section 1981"), and the Family and Medical Leave Act, as amended, 29 U.S.C. § 2601, et seq. ("the FMLA") to recover from Defendant for back pay, compensatory damages (1981 claim) an equal amount as liquidated damages (FMLA claim), punitive damages (1981 claim) other monetary damages, equitable relief, front pay, declaratory relief, and reasonable attorneys' fees and costs.

## JURISDICTION

2. The Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §1337, Section 1981, and the FMLA and the authority to grant declaratory relief under Section 1981, and the FMLA, and pursuant to 28 U.S.C. § 2201 et seq.

## PARTIES AND COVERAGE

3. At all times relevant hereto, Plaintiff was an employee of Defendant, and resided in Lee County, Florida.

4. Plaintiff worked for Defendant in Lee County, Florida, and the venue, therefore, for this case is the Ft. Myers Division of the Middle District of Florida.

5. At all times relevant hereto, Defendant was an employer covered by Section 1981 and the FMLA, because it was engaged in commerce or in an industry affecting commerce who employed 50 or more employees within 75 miles of where Plaintiff worked, for each working day during each of 20 or more calendar workweeks, prior to seeking leave under the FMLA.

6. At all times relevant hereto, Plaintiff was an employee entitled to leave under the FMLA, based on the fact that: (a) she suffered from a serious health condition as defined by the FMLA which necessitated FMLA leave; and (b) she was employed by Defendant for at least 12 months and worked at least 1,250 hours during the relevant 12-month period prior to her seeking to exercise her rights to FMLA leave.

## FACTUAL ALLEGATIONS

7. Ms. Jean is a Black female who worked for Defendant as the Call Center Manager from February 27, 2017, until her termination on July 16, 2018.

8. During her tenure with Defendant, Ms. Jean was an exemplary employee, who had no significant history of performance, attendance, or disciplinary issues.

9. Ms. Jean was often praised by her supervisors and employees, for the excellent quality of her work.

10. Throughout her tenure with Defendant, Ms. Jean fell victim to continuous, severe, and pervasive race discrimination, harassment, and retaliation at the hands of Defendant's management team, in direct violation of Section 1981.

11. To begin with, on or around March 13, 2017, another Supervisor, Doreen Batscom ("Ms. Batscom"), covertly asked Ms. Jean to meet up for lunch outside of Defendant's headquarters.

12. During this offsite meeting, Ms. Batscom, one (1) of only three (3) African American supervisors who worked for Defendant at the time, warned Ms. Jean that Defendant regularly fired Black employees in a disparate manner.

13. This pattern also was corroborated by the other African American Supervisor, Doris Fletcher ("Ms. Fletcher"), who also privately met with Ms. Jean to warn her of the omnipresent race discrimination and harassment permeating Defendant's company.

14. By way of example, but by no means a full account of the race discrimination Ms. Jean endured during her employment, Defendant openly targeted Ms. Jean in a threatening and demeaning manner and displayed clear racial animus toward her for no reason, other than for the color of her skin.

15. To that end, Ms. Jean made to endure abominable comments by regular subordinate employees and even Defendant's upper management, such as, "Get me a rope, lets lynch this N***er;" "Give a N***a a title and all hell breaks loose;" and "Let's send her to the cotton field to manage other N***ers," just to name a few.

16. Despite witnessing the flagrant racial animus toward Ms. Jean by employees and upper management, Defenant refused to take any corrective action, in direct violation of Section 1981.

17. Of course, Ms. Jean regularly complained/objected about these offensive and discriminatory comments directly to Regional Director, Donovan McKee ("Mr. McKee"), Practice Manager, Patricia Kolecki ("Ms. Kolecki"), Human Resources Director, Julie Greaves ("Ms. Greaves"), and Employee Relations Manager, Ornella Toska ("Ms. Toska").

18. Instead of correcting the unlawful and invidious behavior pervading Defendant's work environment, Ms. Jean found herself paralyzed and sickened by the collective response of: "Your people can't take a joke. Before you know it, you're all calling the EEOC trying to get paid."

19. Despite the very apparent and illegal adversity she was facing in her work environment, Ms. Jean was determined to overcome Defendant's discriminatory animus by sheer moral and ethics, as Defendant's upper management refused to take corrective action regarding the race discrimination in her workplace.

20.	As a dedicated and virtuous employee, Ms. Jean took it upon herself to deal with each intolerant and racist insubordinate employee through Defendant's Employment Performance Improvement Plan ("EPIP").

21.	As further evidence of discrimination existing in Defendant's workplace, Licensed Nurse Practitioner ("LPN"), Alixandra Trimmer ("Ms. Trimmer"), while at work, boisterously exclaimed that, "MPG has paid [its] dues to the n***as, so [it] didn't need to have a n***a for a manager. It's time for a manager of our kind to come show them how it's done. Let's bring the whites back to the call center."

22.	LPN, Ms. Laura Jackson responded with: "Damn skippy girlfriend."

23.	Incredibly, Ms. Kolecki and Outbound Call Manager, Kathleen Booth ("Ms. Booth"), laughed in agreement.

24.	Disheartened by this continued racism and indisputable lack of support by Defendant's upper management, Ms. Jean felt helpless.

25.	However, Ms. Jean remained adamant in her ethical and legal obligations as the Call Center Manager.

26.	As such, Ms. Jean issued Ms. Trimmer and Ms. Jackson an EPIP for their conduct.

27.	However, upon notifying Mr. McKee and Ms. Greaves of same, Ms. Greaves refused to allow Ms. Jean to issue same, and brazenly stated, "It was a misunderstanding and you need to stop with all your complaints if you want to keep your job."

28.	The discrimination/harassment to which Ms. Jean was subjected, progressed.

29.	Ms. Jean continued to receive countless complaints regarding Team Lead, Ms. C. Kolecki, and her behavior.

30.	Accordingly, Ms. Jean forwarded most, if not all, of the complaints made by Defendant's other employees regarding Ms. C. Kolecki to Mr. McKee and Ms. Greaves.

31. These complaints ranged from Ms. C. Kolecki harassing and bullying subordinate employees to egregiously discriminating and harassing others, including disabled employee, Chastity Knight ("Ms. Knight").

32. To make things worse, Defendant's management team demanded that Ms. Jean find a reason to fire Ms. Knight, the victim, based on her continued complaints to HR about the conduct to which she was being subjected based on her disability.

33. Ms. Jean refused this illegal instruction and refused to fire Ms. Knight without valid reason or cause.

34. Instead Ms. Jean issued Ms. C. Kolecki a Level 4 EPIP, i.e. termination, after Ms. C. Kolecki, in the presence of the entire call center, threatened Ms. Knight simply because Ms. Knight refused to switch her lunch break with Ms. C. Kolecki.

35. Cruelly, Ms. C. Kolecki stated, "Bitch I'm going to kick you in your broke back!"

36. As a result of the foregoing, Ms. Knight requested a meeting with Mr. McKee, Ms. Greaves, and Ms. Jean.

37. During this meeting, Ms. Knight presented Mr. McKee and Ms. Greaves with a piece of paper written by Ms. C. Kolecki, that stated "Broke Back Bitch," left on Ms. Knight's desk.

38. When Mr. McKee and Ms. Greaves advised Ms. Knight to seek other employment rather than address the illegalities at issue, Ms. Knight informed them that she would be pursuing her legal rights.

39. Peculiarly, rather than take prompt remedial action as the law requires, Defendant decided to allow Ms. C. Kolecki to simply resign.

40. Shockingly, a few months later, Ms. C. Kolecki was rehired and promoted to the Training Department.

41. Most disturbing of all, while a potential new hire, Marcia Vega, waited to be interviewed for the Call Center Operator position by Ms. Jean, Ms. Vega was asked to have a seat outside the employee breakroom.

42. Ms. Trimmer and a few other staff members were inside the breakroom.

43. While seated outside, Ms. Vega, heard Ms. Trimmer state: "Why is your manager trying to fill this place with a bunch of Mexicans and Black people?"

44. Sadly, everyone in the breakroom laughed in response to this comment.

45. As a result of this, Ms. Vega emailed Ms. Greaves and Ms. Jean regarding the events that transpired prior to her interview with Ms. Jean, explaining what she heard.

46. In response to this email, Mr. McKee met with Ms. Jean and threatened her job if she did not destroy Ms. Vega's information/documents and instructed Ms. Jean that she was not answer any phone calls from Ms. Vega.

47. He further stated that if she was ever questioned about this incident to deny ever having knowledge of same and he even went as far as to have Ms. Jean "paint [Ms. Vega] as a horrible candidate."

48. Again, Ms. Jean refused to lie if the time came and even reminded Mr. McKee that Ms. Knight witnessed the interaction.

49. Ms. Jean further objected to the illegal discrimination and comments being made about Blacks and other minorities.

50. In retaliation for these objections, which continued throughout her employment and up until her termination, Defendant terminated Plaintiff's employment.

51. By reason of the foregoing, Defendant's actions, affected Plaintiff's ability to enjoy the "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" in violation of 1981.

52. At all material times hereto, Plaintiff was ready, willing and able to perform her job duties.

53. Defendant does not have a non-discriminatory rationale for allowing and participating in the harassment, discrimination, retaliation, and termination suffered by Plaintiff.

54. Plaintiff suffered sufficiently severe and pervasive discrimination and harassment to create an abusive working environment and ultimately termination, because of her race, and her objections to same.

55. As to the FMLA claims, Ms. Jean suffers from Status Migrainosus and Essential Thrombocythemia.

56. As such, during moments of flare-ups, these medical conditions substantially limit her major life activities of caring for herself, seeing, walking, standing, concentrating, and communicating, and any absences due to the foregoing health conditions are clearly protected by the FMLA. See 29 U.S.C. § 2612(a)(1)(D).

57. Early in her tenure with Defendant, Ms. Jean suffered a flare-up of her medical conditions and had to be admitted to the hospital.

58. Upon discharge, Mr. McKee advised our client that her "migraine situation would create a problem for her job."

59. Further, anytime Mr. McKee noticed Ms. Jean's quiet demeanor during meetings with Ms. Kolecki and Ms. Booth, he would harass her by using a baby voice stating, "What's the matter Veronica, you want us to stop the meeting for your migraine? You sick again? Need to go to the hospital again?"

60. Mr. McKee also made fun of Ms. Jean for taking time off from work for her medical condition claiming, "I wish I could take as many vacations like she does, getting cocktails in the hospital. That's the life."

61. Of course, Ms. Kolecki and Ms. Booth laughed uncontrollably in response to these comments, to which Ms. Jean responded: "My migraines aren't funny, they're painful."

62. On March 12, 2018, Ms. Jean requested FMLA leave due to her serious health condition, and was subsequently approved for same on March 21, 2018.

63. Unfortunately, Ms. Jean suffered another flare-up at work, at which point, Mr. McKee and Ms. Greaves notified her that her job was in jeopardy if her medical flare-ups continued and she missed work for same.

64. Ms. Jean reminded both of them that she was approved for FMLA leave.

65. Shockingly, they insisted that she needed to understand that the FMLA is not a protection from getting fired.

66. The FMLA prohibits employers from "interfering with, restraining, or denying" an employee's exercise of FMLA rights. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(a)(1).

67. The FMLA also prohibits employers from "discriminating or retaliating against an employee… for having exercised or attempted to exercise FMLA rights." 29 C.F.R. § 825.220(c).

68. What was even more problematic, was that Defendant's HR Manager unlawfully informed Ms. Jean that Defendant does not provide intermittent FMLA leave.

69. This comment, of course, is illegal.

70. To that end, failure to provide Ms. Jean with proper guidance and notice of her FMLA rights (which clearly provide for FMLA intermittent leave) was alone, a violation of the FMLA and constituted actionable interference. *See Patterson v. Browning's Pharm. & Healthcare, Inc.,* 961 So. 2d 982, 986 (Fla. 5th DCA 2007).

71. Clearly, Defendant's management and human resources team did not understand the FMLA or its attendant obligations, and interfered with Plaintiff's rights regarding same.

72. To compound the illegalities at issue, on July 11, 2018, Ms. Jean collapsed at work and was rushed to the hospital.

73. As a result, her physician provided her with medical documentation excusing her from work – through July 16, 2018.

74. As a dedicated employee, Ms. Jean notified Defendant of her absence for medical reasons, and immediately upon discharge, provided Defendant with a doctor's note further corroborating/explaining her time off and protected absences.

75. However, it came as an utter shock to Ms. Jean when on the date of her return from what should have been protected FMLA leave, she was immediately fired because, according to Defendant, her position was being eliminated.

76. In response to this, Ms. Jean requested to be placed in a different department, but Defendant refused to allow her employment to continue.

77. Shortly thereafter, Defendant hired a Caucasian Call Center Manager who was not FMLA protected to replace her.

78. Terminating an employee for utilizing FMLA leave, is the very definition of interference and retaliation, under the FMLA. See 29 C.F.R. § 825.220(a)(2).

79. As a result of this illegal conduct, Plaintiff has suffered damages, including loss of employment, wages, benefits, and other remuneration to which she is entitled.

80. As a result of the foregoing, Defendant interfered with Plaintiff's FMLA rights, and retaliated against her for attempting to utilize what she believed to be proper and authorized FMLA leave.

81. Defendant acted with intent to terminate Plaintiff when she should have been, and was, FMLA covered.

82. Defendant fired Plaintiff because of her need for FMLA protected time away from work.

83. Defendant purposefully and intentionally interfered with, and retaliated against Plaintiff, for her attempt to use FMLA.

84. Defendant did not have a good faith basis for its actions.

85. Defendant did not have a legitimate reason for termination.

86. The temporal proximity between Plaintiff's use of FMLA leave and her objections to Defendant's illegal discrimination are sufficiently close to create a close nexus in time between the two events.

87. Defendant's articulated reason for Plaintiff's termination is a pretext.

## COUNT I:
## AGAINST DEFENDANT FOR DISCRIMINATION/ HARASSMENT/RETALIATION UNDER 42 USC 1981

88. Plaintiff realleges and adopts the allegations contained in paragraphs 1-5, 7-54, 77, and 84-87 of this Complaint, as if fully set forth in this Count.

89. The acts of Defendant by and through its agents and employees, violated Plaintiff's rights against race discrimination/harassment and retaliation under Section 1981.

90. The discrimination/harassment/retaliation to which Plaintiff was subjected was based on her race, Black, and her objections to Defendant's illegal discrimination and harassment in the workplace.

91. The conduct of Defendant its agents and employees proximately, directly, and foreseeably injured Plaintiff, including, but not limited to, lost wages and benefits, future pecuniary losses, emotional pain and suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

92. The conduct of Defendant was so willful and wanton, and in such reckless disregard of the statutory rights of Plaintiff, as to entitle her to an award of punitive damages against Defendant to deter it, and others, from such conduct in the future.

93. Plaintiff is entitled to recover reasonable attorneys' fees and litigation expenses pursuant to Section 1981.

94. Plaintiff has no plain, adequate or complete remedy at law for the actions of Defendant, which have caused, and continue to cause, irreparable harm.

### REQUEST FOR RELIEF AS TO COUNT I

WHEREFORE, Plaintiff prays that this Court will:

95. Issue a declaratory judgment that the discrimination/harassment and retaliation against Plaintiff by Defendant was a violation of Plaintiff's rights under Section 1981;

96. Require that Defendant make Plaintiff whole for her losses suffered as a result of the discrimination/harassment and retaliation through reinstatement, or, if that is not practical, through and award of front pay;

97. Grant Plaintiff a judgment against Defendant for all available damages, including punitive damages;

98. Award Plaintiff her reasonable attorney's fees and litigation expenses against Defendant pursuant to 1981;

99. Provide any additional relief that this Court deems just and appropriate.

### COUNT II
### UNLAWFUL INTERFERENCE & RETALIATION UNDER THE FMLA

100. Plaintiff realleges and adopts the allegations contained in paragraphs 1-9, and 55--87 of this Complaint, as if fully set forth in this Count.

101. At all times relevant hereto, Plaintiff was protected by the FMLA.

102. At all times relevant hereto, Defendant interfered with and retaliated against Plaintiff by interfering with, and retaliating against her, for her attempted use of, what should have been, FMLA protected leave.

103. At all times relevant hereto, Plaintiff was protected from interference/retaliation under the FMLA.

104. At all times relevant hereto, and for purposes of the FMLA retaliation claim, Defendant acted with the intent to retaliate against Plaintiff, because Plaintiff exercised her rights to take approved leave pursuant to the FMLA.

105. As a result of Defendant's intentional, willful and unlawful acts by interfering with, and retaliating against, Plaintiff for exercising her rights pursuant to the FMLA, Plaintiff has suffered damages and incurred reasonable attorneys' fees and costs.

106. As a result of Defendant's willful violation of the FMLA, Plaintiff is entitled to liquidated damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant for back pay, an equal amount as liquidated damages, other monetary damages, equitable relief, declaratory relief, reasonable attorneys' fees and costs, and any and all further relief that this Court determines to be just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

DATED this 15th day of July, 2019.

Respectfully Submitted,

By**:/s Noah E. Storch**
Noah E. Storch, Esq.
Florida Bar No. 0085476
Richard Guadagnolo, Esq.
Florida Bar No. 109104
RICHARD CELLER LEGAL, P.A.
10368 W. SR. 84, Suite 103
Davie, Florida 33324
Telephone:  (866) 344-9243
Facsimile:   (954) 337-2771
E-mail: noah@floridaovertimelawyer.com
E-mail: rich@floridaovertimelawyer.com

*Attorneys for Plaintiff*